In the Matter of MORRIS B. PERLMAN, as Chairman of a Committee of 76 Tenants of Premises 72–17 34th Avenue, Jackson Heights, Queens, Appellant, v. ROBERT E. HERMAN, as State Rent Administrator, Respondent, and ADCO REALTY Co., Intervenor-Respondent.

First Department, April 11, 1961.

*Martin Szold* of counsel (*Szold & Schapiro,* attorneys), for appellant.

*Emory Gardiner* of counsel (*Harold Zucker,* attorney), for respondent.

*Abraham M. Lindenbaum* of counsel (*Lindenbaum & Young,* attorneys), for intervenor-respondent.

BREITEL, J. Tenants appeal from an order dismissing their petition in a proceeding, brought pursuant to article 78 of the Civil Practice Act, to review a determination of the Rent Commission. Landlords' application for a rent increase had been granted, in the over-all amount of $13,310.64, under the fair rent return provisions of the Emergency Housing Rent Control Law.

Involved is whether a recent purchase price of the subject premises qualified as a rent base within the statute '' as the result of a transaction at [arm's] length, on normal financing terms at a readily ascertainable price and unaffected by special circumstances '' or whether the purchase price is not so qualifiable as a rent base because it was the product of a '' package deal '' and the special circumstance affected the price. If the purchase price of $707,443.10 is not available as a rent

base, then the assessed value of $530,000 is the statutorily mandated rent base.

It is concluded, for the reasons to be discussed, that the prior purchase price was the product of a package deal, and was affected by such circumstance, precluding its use as a rent base. As a consequence, the order of Special Term sustaining the determination of the Rent Administrator should be reversed and the proceeding remanded to the Rent Administrator for appropriate action.

The statute authorizes rent increases when the annual return from the property is less than 6% based on the assessed valuation or, in lieu of such assessed valuation, based on the sale price where there has been a bona fide sale of the property since March 15, 1953. To satisfy the statutory standard it is further provided that the sale must be (1) a result of a transaction at arm's length; (2) on normal financing terms; (3) at a readily ascertainable price; and (4) the price must be "unaffected by special circumstances such as a forced sale, exchange of property, package deal, wash sale or sale to cooperative" (Emergency Housing Rent Control Law, § 4, subd. 4, par. [a], cl. [1]; L. 1946, ch. 274, as last amd. by L. 1959, ch. 695).

Confusing the several phases of the transaction which resulted in the sale of the premises, the Rent Administrator argues that the purchase price was not the product of a package deal and was not affected by any special circumstances. The confusion is between the transfers by which three separate rent-controlled properties located in three different boroughs of this city, but under common ownership, were exchanged for a single, newer property, not subject to rent controls, and the simultaneous transfers by which the same three rent-controlled properties were sold to a real estate broker, his relatives, and relatives of his office associate. The real estate broker had arranged the several transfers by triangular negotiation resulting in a simultaneous closing.

The facts are as follows:

The subject property is a multiple dwelling in the Borough of Queens containing 96 rent-controlled dwelling units. It was, prior to April 1959, owned by a close corporation, Lika, Inc., which also owned a rent-controlled multiple dwelling in the Borough of Brooklyn and still another in the Borough of Manhattan. The principals in Lika, Inc. wished to exchange the three rent-controlled properties for a newer multiple dwelling which would be free from any rent controls. For tax reasons they were not interested in cash or its equivalent for their real properties.

Located in Queens was a newer building, free from rent controls, owned by two women surnamed Heller and Gottlieb. These owners were ready to sell their property but they wished cash.

A triangular transaction was obviously indicated. But with equal obviousness, its implementation presented difficulties. A real estate broker named Mr. Murray Adler supplied the ingenuity and implementation.

To effect the exchange between Lika, Inc., which wished only to exchange properties, and the Heller-Gottlieb owners who wished only cash, it was necessary to interpose cash purchasers for the rent-controlled properties. Mr. Adler arranged for the purchases for cash, over existing mortgages, of the three rent-controlled buildings owned by Lika, Inc. He and his two married sisters took the Queens building. This is the building in suit. One sister received the Manhattan building. The wife and sister-in-law of Mr. Adler's office associate received the Brooklyn building. The aggregate cash consideration was paid to the Heller-Gottlieb interests. Their rent control-free property in Queens was transferred to Lika, Inc. All of the transfers occurred simultaneously in April, 1959.*

The rent-controlled Queens property (the premises in suit) was sold for a total price of $707,443.10, subject to a refinanced first mortgage of $300,000, and a new second mortgage of $210,000 taken by the Morgenstern Foundation, the balance being paid in cash. The most recent assessed value is $530,000. The Manhattan property was sold for $317,000, subject to a first mortgage of $136,379.49, and a new Morgenstern second mortgage of $125,000, the balance being paid in cash. The most recent assessed value is $245,000. The Brooklyn property was sold for $303,000, subject to a first mortgage of $137,691.61, and

---

* The transaction may be graphically represented in ultimate result thus:

a new Morgenstern second mortgage of $125,000, the balance being paid in cash. The most recent assessed value is also $245,000.

In June 1959 the new landlords, Mr. Adler and his two sisters, applied for rent increases under the fair rent provisions of the statute. They urged the purchase price of two months before as the proper valuation base.

The critical issue is whether the several cash prices for each of the three rent-controlled properties taken from Lika, Inc., including the multiple dwelling in suit, were market-fixed prices, or self-serving allocations arranged among Mr. Adler, his relatives and friends. There is no question, on the other hand, that the aggregate cash consideration, derived from the sale of the three rent-controlled buildings and paid to the Heller-Gottlieb interests for the control-free multiple-dwelling taken by Lika, Inc., was a market-fixed price determined at arm's length.

The allocation within the aggregate price of the several purchase prices for each of the three rent-controlled properties last described was, of course, determined by Mr. Adler, his sisters, and friends. Lika, Inc., for obvious reasons, would be materially interested only in the ultimate exchange of properties, and the Heller-Gottlieb interests only in the aggregate price of $810,000 received by them. The mortgages, however, were given to institutional investors who presumably dealt with the Adler purchasers at arm's length. Stressed also very much by the owners is that the principals in Lika, Inc., the Heller-Gottlieb interests, and the broker, Mr. Adler, were all unrelated to the adverse parties in negotiation and for all purposes appeared to have dealt with one another at arm's length.

Thus, while the aggregate price for the three properties may have been fair enough, and at arm's length, the same conclusion does not follow with respect to the allocation of the values and the cash prices among these properties upon their transfer to Mr. Adler, his sisters, and friends. This presents the "package deal" which creates the problem in this case. The "package" and the rent control valuation problem presented by it is found not in any one leg of the triangular transaction but is derived from all three legs.

Since 1957 the Rent Administrator has been deprived by legislation of the discretion, which he previously had, to reject or accept a bona fide sales price as a valuation base in fair rent proceedings. However, despite the recent limitation on the Rent Administrator's discretion, it is still true that with regard to sales he is required to make a determination, by means of

the several tests contained in the statute, whether or not the purchase price qualifies as a valuation base (*Matter of Realty Agency* v. *Weaver*, 7 N Y 2d 249, 252; *Matter of Payson* v. *Caputa*, 9 A D 2d 226, 233–234).

The statute, as it now reads, in pertinent part is as follows:

" Provision shall be made pursuant to regulations prescribed by the commission, for individual adjustment of maximum rents where

" (1) the rental income from a property yields a net annual return of less than six per centum of the valuation of the property. Such valuation shall be the current assessed valuation * * * except where there has been a bona fide sale of the property within the period between March fifteenth, nineteen hundred fifty-three, and the time of filing of the application, as the result of a transaction at arms' [*sic*] length, on normal financing terms at a readily ascertainable price and unaffected by special circumstances such as a forced sale, exchange of property, package deal, wash sale or sale to cooperative" (§ 4, subd. 4, par. [a]).

In the statutory context it is evident that a package deal relates to a transfer in which two or more real properties, at least one of which is rent-controlled, are sold conditionally as part of a single transaction.* The singleness of the transaction is not established only by the existence of a single aggregate price. Then, indeed, no serious problem would arise because no one could assert with assuredness that there was any purchase price allocable to any single one of the properties for the purpose of providing a rent base. The serious problem arises, however, where, in a simultaneous transaction, or in a single triangular arrangement, several prices are allocated in a common or pooled negotiation among separate properties, exactly as happened in this case (cf. *Matter of Park South Bldg. Corp.* v. *Herman*, 22 Misc 2d 527). Then the issue, as presented by the statute, is whether such allocated prices had been affected by the circumstance that they were fixed in a " package deal ".

Applying this reasoning, it is not disputable that the subject premises were transferred, in effect, as a part of a single triangular arrangement. The price fixed for each property, in the absence of any countervailing proof, must have been affected

---

* In this case, separate contracts were executed by Heller and Gottlieb and Eastford Investors, Inc., Adler's nominee (a " corporate shell "), for each of the three rent-controlled buildings. Although the contract for the Queens property in suit made no mention of other properties, the contracts for the Manhattan and Brooklyn properties were expressly made conditional upon consummation of all three transfers of the rent-controlled properties.

by the triangular negotiations, and therefore the prices finally determined must have been, within the meaning of the statute, " affected " by the special circumstance. The effect is the greater since the ultimate purchasers of the separate parcels were not dealing with one another at arm's length in the market, by reason of their very close blood, marriage, and office relationships. The effect is overwhelming if the aggregate negotiation on their behalf, as appears to have been the case, was conducted exclusively or in large measure by Mr. Adler. The transfers, of course, passed through his nominee corporation.

It is thus of no consequence that the aggregate cash price paid to the Heller-Gottlieb interests was a fair market price fixed at arm's length. Nor is it of any consequence that the consideration received by Lika, Inc., was the product of a transaction at arm's length and represented an exchange of fair market values. The rub is in the division of the aggregate value of the three rent-controlled properties, among Mr. Adler, his sisters and friends.

It follows from the foregoing analysis that a package deal need not be single-phased but may be multiphased. Nor does a package deal to be such require any element of fraud or duplicity, albeit the tenants make wild assertions to that effect and the owners believe that they are entitled to higher rents based on the prior purchase price if only they can establish their innocence from sin. The question is simply an economic one, namely, whether the single-parcel prices have been objectively fixed with reference to the competitive market, as the statute requires, or whether they are simply the product of intimates working together, even if sincerely, or worse, the mental product of the sole and trusted manager of one side of the transaction, Mr. Adler.

The owners have, by an interesting tabulation, sought to show that the allocated purchase prices approximate, roughly, the equalized assessed values of each of the three properties. This is fair argument to show that the allocation was a fair one; nevertheless, it does not satisfy the objective standards which the statute requires of a purchase price to be eligible. Such a purchase price, if specially circumstanced, must be shown, not only to be readily ascertainable, but also to have been unaffected by the circumstance that it was determined in connection with a package deal.

In *Matter of Payson* v. *Caputa* (9 A D 2d 226, 234, *supra*) it was said, in words quite applicable here: " The statute does not provide that the mere presence of special circumstances precludes use of a sale price, or at least such a reading is not

unequivocally required. It does stipulate that the sale price be 'unaffected' by the special circumstances. Of course, it is difficult to think of a forced sale, an exchange of property, a package deal, or a wash sale, in which the price would not be affected by such special circumstances so as to be utterly unreliable. Each one of these categories by very definition would seem to preclude the finding of a readily ascertainable and reasonable price in a fair market.''

The forecast of special difficulty in the *Payson* case is further evidenced in this very matter. While the owners have shown a high correlation between equalized assessed valuation and the allocated purchase prices, a similar analysis of the three second mortgages placed on the three properties by the Morgenstern Foundation negatives the effect of such correlation.

Thus, it is quite significant that with regard to the premises in suit the mortgage financing covered but 72% of the purported price. In contrast, similar financing covered 82% of the purported price of the Manhattan property and 87% of the purported price of the Brooklyn property.* Of course, neither comparison, that is, by equalized assessed valuation or arm's length mortgage financing, is conclusive of the fair value. All of this, however, is conclusive of the unreliability of accepting a merely subjective allocation of the aggregate purchase price for the three properties. It, therefore, follows, and the Rent Administrator could not reasonably conclude otherwise on the present record, that the transfer of the controlled properties was part of a package deal at prices fixed, not at arm's length, but by Mr. Adler and his intimates. Hence, the allocated prices

---

* *Queens Property*:

| | | |
|---|---|---|
| 1st mortgage | $300,000.00 | |
| 2nd mortgage | 210,000.00 | (72.1%) |
| Cash | 197,443.10 | (27.9%) |
| Purchase Price | | $707,443.10 |

*Manhattan Property*:

| | | |
|---|---|---|
| 1st mortgage | $136,379.49 | |
| 2nd mortgage | 125,000.00 | (82.5%) |
| Cash | 55,620.51 | (17.5%) |
| Purchase Price | | $317,000.00 |

*Brooklyn Property*:

| | | |
|---|---|---|
| 1st mortgage | $137,691.61 | |
| 2nd mortgage | 125,000.00 | (86.7%) |
| Cash | 40,308.39 | (13.3%) |
| Purchase Price | | $303,000.00 |

were necessarily affected by the special circumstance of the transaction being a package deal.

Consequently, for the reasons given and on the present record the only proper valuation base is that provided by the assessed value. Of course, if the owners are able to assume the heavy burden of showing by evidence, not in the present record, that the several prices of the rent-controlled properties were somehow objectively fixed with reference to the market, at arm's length, without being affected by the package deal, they may apply to the Rent Administrator to reopen the proceeding.

Accordingly, the order of Special Term dismissing the petition should be reversed, on the law and on the facts, with costs and disbursements to appellant, the petition granted, the determination of the Rent Administrator annulled, and the proceedings remanded to the Rent Administrator for the purpose of redetermining the fair rent return on the subject premises in accordance with the views expressed, and utilizing, in the absence of a qualifying prior purchase price, the assessed value of such premises.

BOTEIN, P. J., RABIN, STEVENS and BERGAN, JJ., concur.

Order entered on October 19, 1960, denying petitioner's application for an order annulling the determination of respondent, State Rent Administrator, granting rent increases under the fair rent return provisions of the Emergency Housing Rent Control Law, and dismissing the petition, unanimously reversed, on the law and on the facts, with $20 costs and disbursements to the appellant, the petition granted, the determination of the Rent Administrator annulled, and the proceeding remanded to the Rent Administrator for further proceedings in accordance with the opinion of this court.

